[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 5, 2005
THOMAS  K. KAHN
CLERK

No. 04-12009

D. C. Docket No. 01-00796 CV-C-E

JAMES CALLAHAN,

Petitioner-Appellee,

versus

DONAL CAMPBELL, Commissioner,
Alabama Department of Corrections,
ATTORNEY GENERAL OF ALABAMA,

Respondents-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(October 5, 2005)**

Before TJOFLAT, BLACK and WILSON, Circuit Judges.

BLACK, Circuit Judge:

James Callahan was convicted and sentenced to death in Alabama state court for the intentional murder of Rebecca Suzanne Howell. Callahan filed a federal habeas corpus petition pursuant to 28 U.S.C. § 2254, which was granted in part and denied in part. The Government and Callahan both appeal the district court's decision. The district court granted a certificate of appealability on four of Callahan's claims: (1) the trial judge's failure to recuse himself violated his Sixth Amendment rights; (2) he received ineffective assistance of counsel due to his counsel's failure to object to the admission of his statements based on a prior ruling of the Alabama Supreme Court; (3) his statements should not have been admitted because they were involuntary and obtained in violation of the right to counsel;[1] and (4) he received ineffective assistance of counsel at sentencing due to his counsel's failure to investigate and present mitigating evidence. We affirm the district court's denial of claim (2) and reverse the district court's grant of relief on claims (1) and (4).

---

[1]Callahan did not argue to this Court that his statements should not have been admitted because they were involuntary and obtained in violation of the right to counsel. He has therefore waived that claim. *See Stephens v. Hall*, 407 F.3d 1195, 1202 (11th Cir. 2005).

## I. BACKGROUND

This appeal comes to us more than 23 years after the death of Rebecca Suzanne Howell. In the interim, there have been two trials, two sentencing hearings, two direct appeals, a post-conviction relief proceeding in state court, which included a two-day evidentiary hearing, and the current habeas petition. In order to place the issues and our decision in the proper context, it is necessary for us to review the entire history of the case.

A.   *Facts*

   1.   *Becky Howell's Disappearance*

On February 3, 1982, around 11:00 p.m., Becky Howell met her fiancé, Murray Knight, at the club where he was performing with his band in Jacksonville, Alabama. Howell, 26, was a student at Jacksonville State University. After visiting Knight for 10 to 15 minutes, Howell went across the street to the Norge Washerteria to do laundry. Howell was supposed to return to the club, but when Knight's band finished playing at 1:30 a.m., she had still not returned. Knight became worried and went to the washerteria to look for Howell. He found her car, her school books, her laundry, and her jacket, but he did not find her. Knight called the police, and Officer Joe Carter and Sergeant Kathy Thienes responded. The officers searched the area and discovered a roll of gray duct tape

3

and a pair of men's blue jeans in the vicinity of Howell's car but found no other evidence of Howell's whereabouts.

On February 17, 1982, two weeks after her disappearance, Howell was found dead of asphyxiation in the Tallasseehatchee Creek in Calhoun County, Alabama—her hands were taped together; her belt was on upside down; and she was not wearing pantyhose, socks, or shoes. A vaginal swab revealed the presence of seminal fluid.

2. *James Callahan Becomes a Suspect*

On the night of Howell's disappearance, Jimmy Dunagan was in his car outside of a washerteria six or seven blocks from the Norge Washerteria. Around 11:00 p.m., Dunagan observed a late model green Ford pickup truck being driven by a man, pull into a parking lot across the street from a young woman in a phone booth. After watching the woman for about ten minutes, the man in the truck pulled out of the parking lot and parked within ten feet of the woman in the phone booth. A few minutes later, the woman left the phone booth, and as she passed by the green truck, she began running to her car. When the woman drove away, the green truck followed her for several blocks, stopping when she turned onto Jacksonville State University campus. Dunagan followed the truck and wrote down its tag number. On February 20, Dunagan told Detective Max Kirby what

4

he saw on February 3 and that the tag number of the truck was either "NRF467" or "RNF467."

Kirby searched the database for tag number "NRF467" and nothing came up, but the tag number "RNF467" belonged to an orange Ford truck registered to James Callahan. Further investigation revealed the "RNF467" tag was now on a green 1982 Ford pickup truck. On February 21, police located the green Ford outside of the residence of Harvey Callahan, the defendant's father. Dunagan identified the truck at Harvey Callahan's as the same one he saw on February 3 at the washerteria.

Starting at 9:30 p.m. on February 21, police staked out the green Ford. Around 5:00 a.m. the next morning, Deputy Johnny Alexander and Sergeant Thienes observed James Callahan get into the truck and drive away. The officers pulled Callahan over for driving with a switched tag. Callahan opened the driver's side door, placed something behind the seat of his truck, and exited, leaving the driver's side door open. The officers explained to Callahan that he was going to be ticketed for having the wrong tag on his vehicle. At this point Callahan became very nervous and attempted to get back to his truck. Callahan walked around Alexander and, without getting back into the truck, shut the previously open driver's side door and locked it. The officers then transported Callahan to the jail

5

so they could write him a ticket for driving with a switched tag.[2] After receiving

his ticket, Callahan was told investigators would like to talk to him and he could

wait for them in the lobby. He agreed. At approximately 9:00 a.m., Callahan was

placed under arrest for violating his probation by driving a vehicle with an

incorrect tag.[3] A subsequent search of Callahan's truck revealed, *inter alia*, a

pistol, a pillow, and two pairs of men's blue jeans.

3.    *Callahan's Statements to Police*

Over the course of February 22 and 23, Callahan gave four statements to the

police concerning his whereabouts and actions on the night of February 3.[4] Before

each statement Callahan was read his *Miranda* rights and signed a waiver of

counsel. Statement #1 was given orally to Kirby who transcribed it. Statements

#2, #3, and #4 were given during questioning by Assistant District Attorney

Joseph Hubbard; the latter three statements were audio taped and transcribed by a

court reporter.

---

[2]Callahan had to be taken to the jail to receive his ticket because the administrative policy of the sheriff did not allow officers to carry ticket books in their cars. Anyone who received a ticket for a traffic offense in Calhoun County would be taken to the jail to receive their ticket. The jail, courthouse, and sheriff's department were all located in the same building.

[3]Callahan was convicted twice in 1979 for assault with intent to murder and was still on probation for those crimes on February 21, 1982 .

[4]We will also discuss what has been referred to as a "fifth statement."

a. Statement #1: February 22, 9:30 a.m.

Callahan stated he went to a washerteria between 7:30 p.m. and 7:45 p.m. and was driving a green 1982 Ford pickup truck.[5] After going to get something to eat, he returned to the washerteria and left again at approximately 10:00 pm. He then went to the Jacksonville Hospital where he met his father who was visiting the defendant's mother. At 11:00 p.m., Callahan left the hospital and followed his father to his father's house, where Callahan remained for the rest of the night.

b. Statement #2: February 22, 1:45 p.m. to 3:25 p.m.

Callahan stated he arrived at a washerteria around 10:00 p.m. Howell was not there. Callahan placed his clothes in a washing machine and left to get something to eat. When he returned to the washerteria approximately 30 minutes later, Howell was there by herself. Callahan knew Howell because Billy Griffith's wife introduced them to each other at the Jacksonville Nursing Home a few years ago. Since they were introduced, Callahan and Howell spoke in passing several times. That night, Callahan told her he was thinking of renting out his mobile home and asked if she was interested. He offered to take her there and told her to think about it while he went and visited his mother in the hospital. He left to go to the hospital around 11:00 p.m. and returned around 12:00 a.m. When he

_____

[5]In each of Callahan's statements he was driving a green 1982 Ford pickup truck.

7

returned, Howell told him she would like to see the mobile home that night.  It was at this time that Gladys Callahan, the defendant's estranged wife, pulled up outside of the washerteria, but did not enter and soon drove off.

Callahan and Howell left the washerteria at approximately 12:10 a.m. Howell entered Callahan's truck on the driver's side because you could not get in on the passenger side.  Five minutes after they arrived at his mobile home, Gladys also arrived and accused Callahan of "running around" on her.  After arguing with Gladys for roughly 20 minutes, Callahan told her he and Howell were leaving. That was when Gladys removed a pistol from her pocketbook and pointed it at Callahan.  She then directed Callahan and Howell into the kitchen where she forced Callahan to tape Howell's hands together.  A few minutes later Callahan escaped out the back door of the mobile home and drove away, leaving Howell alone with Gladys.  He did not have sexual relations with Howell.

c.       Statement #2 (addendum): February 22, 3:48 p.m.[6]

Callahan stated that about a year and a half prior to February 3, he had dated Howell, and they had sexual relations on one occasion.  When Callahan saw Howell at the washerteria, after returning from the restaurant, Howell intimated that she wanted to have sex with Callahan again.  In particular, she said, "I

---

[6]Callahan wanted to add more detail to his previous statement.

remember several of the good times we had at one time. Are the good times still out there?" Callahan replied, "I don't know. Why don't you try it and we'll find out." After Callahan returned from the hospital, Howell said she wanted to look at Callahan's mobile home and commented, "We'll have a good time once we get there." Callahan and Howell arrived at the mobile home, had sex, and were still in bed when Gladys entered the bedroom. Gladys pointed a pistol at them and ordered them to move to the kitchen. Callahan taped Howell's hands together then escaped through the back door.

          d.      Statement #3: February 23, 10:20 a.m.

After the officers retrieved a photograph from Callahan's father's house at Callahan's request, he stated his wife may have thought Howell was the woman in the photograph, Malera Fox. Callahan's wife was very jealous of Fox. Callahan further detailed his relationship with Becky Howell. He and Howell first met in 1977 at Federal Mogul where they were introduced by Billy Griffith. Callahan asked her out and gave her his phone number. The following weekend they went out on a date. Callahan told Howell he was currently seeing someone, but he was not sure he wanted to stay with that person. Two weeks later Callahan took her water skiing on his boat. While on the boat, they had sex and Howell told Callahan he needed to make up his mind who he wanted to be with or she would

9

not see him anymore. They next spoke three months later, when Howell told him she had started seeing someone else, but could call it off very easily if Callahan would leave his girlfriend. After that, Callahan only spoke briefly with her on two occasions before they met in the Norge Washerteria on February 3.

        e.        Statement #4: February 23, 2:50 p.m.

Callahan stated that on February 4, he went to the Norge Washerteria, for the first time that night, a little after 12:00 a.m. There were several people in the washerteria, including Howell, whom he had met before. He placed his clothes in a washing machine and then went to eat at a restaurant. Callahan returned to the washerteria at approximately 12:30 a.m.

> MR. HUBBARD: What did you do when you arrived back at the Laundromat from Gino's?
>
> MR. CALLAHAN: I talked with her a few minutes, and I asked her, I said, 'Becky, you're needed over yonder.' She said, 'For what?' And I said, 'You're just needed over yonder.' I said, 'Come on, I'll carry you over there.'
>
> MR. HUBBARD: All right. What did you mean when you said, 'You're needed over yonder'?
>
> MR. CALLAHAN: I just told her she was needed across the road.
>
> MR. HUBBARD: Did you mention anybody's name in particular?
>
> MR. CALLAHAN: No. I didn't mention nobody's name. I just told her she was needed.

MR. HUBBARD: Did you say who she was needed by, Mr. Callahan?

MR. CALLAHAN: No, I didn't.

MR. HUBBARD: What did she respond when you said somebody needed her over there?

MR. CALLAHAN: She said, 'Undoubted it must be my boyfriend.' She said, 'That's the only one I know that'd be over there.'

MR. HUBBARD: All right. Did you say anything else to her at that time?

MR. CALLAHAN: We started out the door and she said, 'Well, I'll just take my car.' I said, 'No. Get in the truck and we'll go in it.'

. . . .

MR. HUBBARD: After you got outside with Miss Howell, what happened then?

MR. CALLAHAN: She said a few things. She said, 'I'll just drive my car.' I said, 'No. Go ahead and get in the truck.' I said, 'I'll carry you over there.'

MR. HUBBARD: What did she say?

MR. CALLAHAN: She started to the truck and she changed her mind just about the time she started to get in the truck.

MR. HUBBARD: What happened then?

MR. CALLAHAN: I told her, 'Just go ahead and get in.' I said, 'We got to go.'

11

MR. HUBBARD: What else did you say?

MR. CALLAHAN: That was about the extent of it. I told her to just go ahead and get in the truck and let's go. And she said, 'Well, I don't know. I might ought to just take my car.' And I said, 'Well, no, not really.' I said, 'You need to just go get in the truck.'

MR. HUBBARD: Did you say anything about hurting her, Mr. Callahan, if she didn't go with you?

MR. CALLAHAN: No. Really, I didn't say anything about actually hurting her or harming her. I guess she might have thought I would have, though, on account of there was a Bowie knife laying up on the dash of the truck at that time.

MR. HUBBARD: Did you point to the Bowie knife?

MR. CALLAHAN: No. I didn't actually point to it. It was just laying there.

MR. HUBBARD: Did she see it?

MR. CALLAHAN: Yes, sir.

MR. HUBBARD: Did she say anything about the Bowie knife?

MR. CALLAHAN: When she turned around and seen it she didn't say anything, she just sat down.

MR. HUBBARD: She sat down where?

MR. CALLAHAN: In the seat, and slid over. There was no way to get in the passenger side there at that particular time.

. . . .

12

MR. HUBBARD: After you got in—after she got inside the truck, what happened then?

MR. CALLAHAN: I started over that way. She said, 'What's going on Jimmy?' And I said, 'I just want to get you by yourself again.'

MR. HUBBARD: What did she say?

MR. CALLAHAN: She said, 'I don't know.' I said, 'Well, I just want to be by you—just be with you again.'

MR. HUBBARD: She said she wanted to be with you again?

MR. CALLAHAN: No. I wanted to be with her again.

MR. HUBBARD: Mr. Callahan, she didn't want to be with you?

MR. CALLAHAN: Not at that particular time.

MR. HUBBARD: Did she scream at any time?

MR. CALLAHAN: No, she did not.

MR. HUBBARD: Did she try to get away from you?

MR. CALLAHAN: Not to try and get away. She just told me, she said, 'Stop the truck and let me out. And I'll forget anything ever happened.'

Callahan's story then changed:

MR. HUBBARD: Okay. All right. Jimmy, you went inside the Laundromat and you told Miss Howell that she was needed across the street; is that correct?

MR. CALLAHAN: Right.

13

MR. HUBBARD: All right.  And then what did she do?

MR. CALLAHAN: She didn't know whether it was true or not and she jumped up and took off to the door.

MR. HUBBARD: All right.  She ran to the door.  What did you do then?

MR. CALLAHAN: I just followed behind her.

MR. HUBBARD: All right.  What did you do then?

MR. CALLAHAN: When she went out toward her car I told her the best thing to do—when I put my hand on her shoulder, I said, 'Best thing to do is just go get in the truck.  Don't holler, don't say nothing.'

MR. HUBBARD: Then what happened?

MR. CALLAHAN: Then to start with she just bucked on me.  She said, 'I don't know.'  I said, 'Well, I don't want to have no trouble.'  I said, 'Best thing to do is just go on.'

MR. HUBBARD: All right.  Then what happened?

MR. CALLAHAN:  So, she got in the truck and she started to change her mind just about the time she got to the truck.  She reached up in the truck and grabbed the tape and throwed it back out.

Callahan took her to his trailer and locked her in the bedroom.  He kept her locked in the bedroom the entire day of February 4.  That night, Callahan asked Howell to have sex with him, and she said she would if he let her go.  Later that night, after they had sex, Callahan taped Howell's hands together and drove her to the

14

Tallasseehatchee Creek bridge. He bound her hands to make it look like she had escaped. When they neared the bridge, Howell jumped out of the passenger side door and ran toward the creek, which was about 30 yards away. Callahan drove off and did not pursue her.

### f. Judge Monk's Involvement

While Callahan was giving his fourth statement, attorney Fred Lybrand, at the request of Callahan's father, came to Sheriff Snead's office to talk with Callahan. The Sheriff asked Lybrand if he represented Callahan and Lybrand said no. The Sheriff told Lybrand he would not allow him in to talk with Callahan because Callahan was being interrogated and had not requested a lawyer. Having been refused access to Callahan, Lybrand went to see Judge Samuel Monk (who would later preside over both trials). Lybrand explained to Judge Monk that he was trying to speak with Callahan at the request of Callahan's father, but the Sheriff would not let him because Callahan was being interrogated and had waived his right to an attorney. Judge Monk accompanied Lybrand to the Sheriff's office and spoke with the Sheriff. The Sheriff told Judge Monk what he had told Lybrand, and then Judge Monk entered the interrogation room after knocking. The best evidence of what happened when Judge Monk entered the room comes from the transcript:

15

MR. HUBBARD: Jimmy, is there anything else you want to add of your own free will at this time?

MR. CALLAHAN: I didn't mean to hurt anybody. She just jumped out and run.

JUDGE MONK: Excuse me, Mr. Callahan. Excuse me. May I interrupt?

MR. HUBBARD: Yes, sir.

JUDGE MONK: Mr. Callahan, I'm Judge Monk. Now, I know you've been explained your rights so far.[7] I want to run over those rights with you once again. Do you understand what I'm saying?

MR. CALLAHAN: Right.

JUDGE MONK: All right. And do you understand that you have the right to remain silent in this case and not cooperate with the police in anyway?

MR. CALLAHAN: Right.

JUDGE MONK: Do you understand that anything that you tell them can and will be used against you in court by the State in the prosecution of this case?

MR. CALLAHAN: Yes, sir. I do.

JUDGE MONK: Do you understand that you have a right to discuss the case or to talk with an attorney before any questioning proceeds?

MR. CALLAHAN: Right.

---

[7]On pages 22–23, *infra*, we discuss the basis of Judge Monk's statement that he knew Callahan had been read his rights.

JUDGE MONK: All right. And do you understand that if you cannot afford to hire an attorney that an attorney will be appointed to represent you and that the questioning will stop until such time as you've had an opportunity to talk with that attorney?

MR. CALLAHAN: I understand all that.

JUDGE MONK: All right. Do you understand that you can stop at any time that you wish to? In other words, that you can stop answering their questions at any time you want to? Do you understand all of that?

MR. CALLAHAN: Right.

JUDGE MONK: Now, it's my understanding that you told them you do not wish to have an attorney with you; is that correct?

MR. CALLAHAN: I don't need one. I just—

JUDGE MONK: All right. Now, let me tell you—listen to me, please, Mr. Callahan. Your father has retained the services of an attorney by the name of Fred Ray Lybrand. Do you know Mr. Lybrand?

MR. CALLAHAN: Yes, I do.

JUDGE MONK: All right. Mr. Lybrand is outside in the outer jail office at this time. He's available to talk to you if you wish to talk to him. However, it's a personal choice of yours. You do not have to speak with Mr. Lybrand if you do not wish to, but he is outside at your father's request, available for you to talk to if you want to do so. Do you understand that?

MR. CALLAHAN: Yes, sir.

JUDGE MONK: Do you want to talk to Mr. Lybrand or would you just—do you want to go ahead and continue talking with the police

officers without talking to him? It's your personal decision, Mr. Callahan, and it must be made by you, not by your father.

MR. CALLAHAN: I'm not trying to hide anything. I just—I'm just upset. I don't want—I didn't want anybody to get hurt over this. It wasn't intentions of nobody getting hurt.

JUDGE MONK: Do you understand my question? Mr. Lybrand is available to speak with you if you want to talk with him, but no one is forcing you or telling you that you have to talk with him. It's your choice. I'm going to ask you again, would you like to talk to Mr. Lybrand before you go any further or would you like to waive your right to talk to Mr. Lybrand?

MR. CALLAHAN: Hold on just for a second. Can I talk to you just a minute?

JUDGE MONK: Mr. Callahan, you cannot look to the police officers to advise you as to your rights. That's something that I've already advised you to, and I know they've given you your rights. But it's a decision that you have to make. Now, I'm going to ask you one more time. Do you wish to speak to Mr. Lybrand or do you want me to tell Mr. Lybrand that you do not wish to speak with him?

MR. CALLAHAN: If my father sent him down here, I might ought to talk to him briefly. But that would be about all.

JUDGE MONK: That's your choice. And they'll stop all proceedings at this point.

The next morning, Lybrand told District Attorney Bob Field that he did not

represent Callahan.

g.     Statement #5: February 24, 11:00 a.m.

Callahan would give no other formal statements after his fourth one, but on February 24, 1982, between 11:00 and 11:30 a.m., Callahan sent word to Kirby that he wanted to see him. What transpired next has been repeatedly referred to as the "fifth statement." Although the evidence Callahan produced is more important than what he said, for simplicity, we will refer to the events on the 24th as Callahan's fifth statement.[8]

Kirby had Callahan brought to see him roughly 30 minutes after Callahan made his request. When Callahan said he wanted to talk about the case, Kirby advised Callahan of his *Miranda* rights, and Callahan signed a waiver of counsel. Callahan told Kirby he could show him where he threw Howell's boots out of his truck. Kirby and Sheriff Snead, accompanied by Callahan, went, among other places, to Callahan's father-in-law's house. Callahan directed the officers to a woodpile, and the officers found a purse behind it. Callahan then directed the officers to his father's house. At his father's house, he removed a knife from a camper and told the officers it was the knife he had in his truck on February 3. The police did not recover a pair of boots at this time.

---

[8]In fact, at the second trial, the State specifically noted it would try to avoid delving into conversations Callahan had with the officers during the trip.

On April 5, 1982, James Callahan was indicted for the intentional murder of Rebecca Suzanne Howell, in violation of Section 2(a)(1) of Act No. 81-178 of the Acts of Alabama and Ala. Code § 13A-5-40.[9]

4.    *The First Trial*

a.    Pre-Trial

Callahan was represented by Wilfred Lane. On April 19, 1982, Lane filed an affidavit asserting his belief that Callahan was suffering from a mental disease that would prevent him from standing trial and assisting in preparing a defense. Lane requested Callahan receive a psychiatric evaluation, and the court ordered Callahan admitted to the Taylor Hardin Medical Facility. After a month of evaluation, a final report was issued by three psychiatrists, Alexander Salillas, C.B. Harden, and James Thompson, diagnosing Callahan with adult antisocial behavior and narcissistic personality. They found he functioned within the normal range of intellectual abilities and was competent to stand trial and assist in his defense.

---

[9]Count I of the indictment read: "James H. Callahan . . . did intentionally cause the death of Rebecca Suzanne Howell, by asphyxiating her by obstructing her airway, and the said James H. Callahan caused said death during the . . . abduction of, or attempt to abduct, Rebecca Suzanne Howell with intent to accomplish or aid the commission of Rape in the First Degree, a felony, or flight therefrom . . . ." Count II charged essentially the same conduct except that the abduction or attempt to abduct was done "with intent to inflict physical injury upon her, or to violate her sexually." Count III included the same basic conduct except that the abduction or attempt to abduct was done "with intent to terrorize."

In addition to the examinations by the aforementioned psychiatrists, Callahan was also interviewed by psychologists Don Whittaker and Allen Shealy. They found Callahan to be of normal intelligence with no signs of psychosis and "a rather dramatic individual who uses frequent and obvious exaggerations in describing personal life events." Callahan told them he used to abuse alcohol, but stopped smoking and drinking in 1981 after a religious conversion. He had a "strained emotional relationship" with his father, but always felt close to his mother. There was no mention in the report of Callahan or his mother being abused by his father.

Vicki Young, a psychiatric social worker, also filed a report based on interviews with the defendant and Mary Callahan, the defendant's mother. Callahan discussed his childhood with Young and indicated he had trouble getting along with his father due to his father's heavy drinking. However, according to Callahan, he cured his father's alcoholism by leaving him outside in a wheelbarrow in 13-degree weather. Callahan said he hit puberty at 14 and dated frequently through his teenage years because he was extremely popular with the young ladies. He also abused alcohol for most of his life—including one time purportedly spending $1200 at the Jack Daniel's refinery on whiskey that did not last him six months—but quit drinking and smoking in 1980.

21

During her talk with Young, Mary Callahan described in great detail the defendant's youth and her own history of psychotic problems. She said the defendant was breast fed, had no problem with toilet training, and began walking at the age of ten months; he was an energetic and ambitious child who always did his chores around the house; and he suffered assorted injuries growing up, such as falling out of a tree house and spilling a pot of hot coffee on himself. Mary Callahan claimed she was the one who had to discipline the children because her husband was often busy and absent from home. She said she began experiencing psychological problems when her first child left home 19 years earlier. Since then, she had been treated approximately 20 times for psychiatric problems. Despite going into great detail about the defendant's upbringing and her own psychological problems, Mary Callahan did not mention the defendant being physically abused by his father.

After being declared competent to stand trial, Callahan made a motion for Judge Monk to recuse himself based on Judge Monk's actions on February 23. Specifically, Callahan argued if the State sought to introduce any of Callahan's statements, then Callahan would want to call Judge Monk as a witness to testify to what he observed in the interrogation room. Judge Monk denied the motion and explained:

Mr. Fred Lybrand an attorney practicing with the City of Anniston approached the Court and informed the Court that Mr. Callahan was being questioned in the Calhoun County Jail and requested of the Court assistance in gaining access . . . to his client whereupon I proceeded to the Calhoun County Jail with Mr. Lybrand; informed the Sheriff, Roy Snead, that Mr. Lybrand was there to see Mr. Callahan and I entered the room where Mr. Callahan was located with a court reporter and I believe two, perhaps three other persons. The record will disclose that I informed Mr. Callahan of his rights and informed him that his father had retained an attorney who wished to speak to him, whereupon Mr. Callahan informed the Court that he did wish to speak with Mr. Lybrand or that he would speak with him. But, the Court knows nothing about the facts and circumstances surrounding the case and I'm denying Mr. Lane's motion to recuse myself. There is no material fact that the Court knows that he had testified to in regard to the voluntariness of any statement.

After Judge Monk's statement, the following discussion occurred:

MR. LANE: Your Honor page twenty-six of the statement that, I am referring to, line fourteen is when you entered the room. It says, "Mr. Callahan, I'm Judge Monk. Now, I know you have been explained your rights so far." Was the Honorable Court present or did the Honorable Court know that the Defendant had had his rights read to him?

THE COURT: No, I did not. That was purely an assumption on my part. You know that no judge participates in any interrogation of any Defendant, you know that of your own knowledge.

23

b.    Trial[10]

During the trial, the State attempted to introduce Callahan's fifth statement (but not the first four) and Callahan objected, arguing the statement was not voluntary.  In support of his objection, Callahan called Fred Lybrand.  Lybrand described Callahan's demeanor on February 23 as tired, somewhat emotional, and almost to the point of tears.  After Lybrand, Callahan attempted to call Judge Monk as a witness, but Judge Monk refused.

After the State offered detailed evidence that Callahan had been read his rights and voluntarily waived them before making his fifth statement, Judge Monk denied Callahan's objection.[11]

In addition to Callahan's fifth statement, the State presented the following evidence against Callahan:

• Jimmy Dunagan testified as to what he saw on February 3.

• Susan Bragg testified she drove by the Norge Washerteria a little after 12:00 a.m. on February 4 and saw a "bluish green Ford pick-up truck" parked outside the washerteria with someone in it.

• Kevin Wayne Prichard testified that on February 4 around 1:00 a.m., he drove past the Norge Washerteria and saw a man and woman inside.  He described the woman as having dark hair and wearing nice clothes.  The

_____

[10]At the first trial, the opening and closing statements of both the guilt and penalty phases were not transcribed.

[11]The State did not offer *any* evidence about the first four statements.

24

man had slightly curly, reddish or brownish blonde hair, which was not well kept. Prichard was struck by the contrast between the pretty girl who was dressed nicely and the ragged man.

• Sergeant Thienes testified she arrived at the Norge Washerteria on February 4 and inspected Howell's car. There appeared to have been an altercation on the hood of Howell's car. She observed fingerprints starting at the top of the hood and continuing all the way down it, including an unusual amount of fingerprints on the lower part.

• Walter Chauncey testified Callahan usually met him at his house in the morning, so the two of them could ride to work together. On February 4 around 5:00 a.m., Callahan called Chauncey and told him he would not be going to work that day. The next day, Callahan showed up at Chauncey's house to ride to work with him. Chauncey observed fresh scratches on both of Callahan's arms. When he asked Callahan if the scratches were from having trouble with his wife, Callahan laughed.

• Karen Howell, Becky's sister, identified the purse the officers found behind the woodpile as Becky's purse.

• Paul Henninger, Callahan's brother-in-law, testified that on February 21, he removed a pair of boots from Callahan's trailer and turned them over to the police a few days later.

• Donna Howell, Becky's sister, identified the boots removed from Callahan's trailer by Henninger as belonging to Becky.

• Fulton Prevost, an Identifications Officer for the State of Alabama, testified that fingerprints on the roll of gray duct tape found outside the Norge Washerteria matched Callahan's fingerprints.

• Dr. Joseph Embry, a Forensic Pathologist, testified Howell had a one and a half inch in diameter bruise on her left temple that was present at least 30 minutes before she died, and that her legs and feet showed no scratches or other evidence of trauma. In Dr. Embry's medical opinion, Howell could

25

not have run through the area of woods near the creek where Callahan said she did.

- Items recovered from the search of Callahan's truck included a loaded .25 caliber automatic pistol, several pairs of jeans, and a pillow.

- John Case, a criminalist with the Alabama Department of Forensic Sciences, testified that the two pair of blue jeans recovered from Callahan's truck were sized 29 ½ by 30 and 30 by 30. The blue jeans found outside the Norge Washerteria were sized 30 by 32. Case also made several conclusions regarding hair and fiber samples: a strand of human hair recovered from a mop in Callahan's trailer was microscopically consistent with a sample of hair from Howell; a sample of hair taken from Howell's dog was microscopically consistent with dog hair found in Callahan's truck; acrylic fibers in the pocket of the jeans found outside the Norge Washerteria were the same type of fibers present in the carpet of Callahan's trailer; and a piece of white duct tape recovered from a window pane at Callahan's trailer was identical in construction and chemical properties to the tape used to bind Howell's hands. Case could not say with certainty that the hair, fibers, and tape were the same, only that they were consistent.

- Roger Morrison, a criminalist in the Department of Forensic Sciences in the Huntsville Regional Hospital, testified that he analyzed a vaginal swab taken from the victim, a semen sample from her fiancé, Murray Knight, and a saliva sample from Callahan to determine which, if any, came from a "secretor."[12] The vaginal swab had antigens on it that were indicative of a Group O secretor. Callahan's saliva sample contained antigens, indicative of a Group O secretor. Knight's semen sample had no antigens present, meaning he was a non-secretor.

Callahan called several witnesses in his defense. Robert Blackwelder, a

professor with an expertise in fingerprint identification, did not dispute that the

---

[12]Morrison described a secretor as someone who secretes normal ABO blood factors into their biological fluids. He stated that approximately 80% of the population are secretors.

26

fingerprint found on the roll of duct tape was Callahan's, but he opined that Callahan's print found on the tape was unusually full and complete. Blackwelder also questioned the reliability of hair and fiber comparisons, stating one could not be certain that a particular loose hair came from a particular individual and that dog hair comparisons were less reliable than those of human hair.

James Fox testified Callahan visited him from the 8th to the 16th of February in Lake Charles, Louisiana. Fox did not recall seeing any scratches on Callahan's arms. According to Michael Callahan, the defendant's brother, he and his father went to the defendant's trailer on February 14 and observed a plastic milk container full of gasoline on a lit gas stove. Michael Callahan turned off the gas to the stove and left. It appeared to him that someone was trying to blow up the trailer. Paul Henninger, the defendant's brother-in-law, testified he removed a container of gasoline from the stove at the defendant's trailer. Two days later, the defendant arrived at Henninger's house early in the morning and told Henninger he was on his way back from Lake Charles, Louisiana. Henninger did not observe scratches on Callahan's arms. Sharon Henninger, the defendant's sister, testified she also saw Callahan on February 16 without his shirt on and did not see any scratches.

The jury found Callahan guilty on all three counts.

c.      Sentencing—Jury Recommendation

The State called Forrest Dobbins, Clerk of the Calhoun County Court, and Hubbard. Dobbins read into evidence copies of Callahan's two convictions for assault with intent to murder, and Hubbard confirmed Callahan was the individual convicted of those offenses. Callahan called Boyce Callahan, his uncle, Caroline Callahan, his aunt, and Marie Callahan, his sister-in-law. According to Boyce, he knew the defendant for his entire life and never knew him to get into any trouble or hurt anyone. Boyce believed his nephew was a very nice person who just got emotional sometimes. Caroline Callahan testified she knew the defendant for almost his entire life; she never saw him threaten or hurt anyone and did not believe he would do so. She also stated Callahan held a regular job and always supported his two children. Boyce and Caroline Callahan were both asked to tell the jury anything that might help them in making their recommendation. Boyce told the jury the defendant had made a recent commitment to God, and Caroline reasserted her belief that the defendant could never hurt anyone. Marie Callahan said she knew the defendant for 11 years, and he always held a job, supported his children, and never hurt anyone. On cross-examination, all three witnesses admitted they knew Callahan had been convicted of firing a gun into his ex-wife's trailer, hitting his 11-year-old niece in the foot. None of the witnesses mentioned

28

abuse, physical or sexual, occurring in the Callahan household while the defendant was growing up.

The jury recommended a sentence of death.

d.      Sentencing—Trial Court's Findings

At the sentencing hearing, Callahan introduced notes from interviews conducted by Richard Thompson, a private investigator.  Thompson interviewed people who knew James Callahan, and Callahan hoped the notes would show that some individuals in the community had a more favorable attitude towards Callahan than indicated in the pre-sentence report.  The State offered no evidence.

In accordance with Ala. Code §§ 13A-5-47, 13A-5-51, the trial court made findings with respect to potential aggravating and mitigating factors.  On the aggravating side, the court found the defendant had been previously convicted of two separate felonies involving the use of violence to the person, and the capital offense was committed during the commission of a kidnapping in the first degree. The court found no mitigating factors present.  As such, the court concluded the aggravating factors outweighed the mitigating factors, supporting the jury's recommendation, and sentenced Callahan to death.

### e. Direct Appeal

The Alabama Court of Criminal Appeals affirmed Callahan's conviction and sentence. *Callahan v. State*, 471 So. 2d 447 (Ala. Crim. App. 1983). The Alabama Supreme Court, addressing only the introduction of Callahan's fifth statement, reversed. *Ex parte Callahan*, 471 So. 2d 463 (Ala. 1985) (*Callahan I*). In a 6-3 decision, the Alabama Supreme Court held that the fifth statement was improperly admitted because the State had failed to meet its burden of showing the fifth statement was not tainted by a prior, improperly taken confession. *Id.* at 470–71. Callahan's conviction and sentence were vacated, and the case was remanded for a new trial.

### 5. *The Second Trial*

### a. Pre-Trial

Wilfred Lane was replaced by Harold Knight as Callahan's counsel. Knight hired Louis Wilkinson to assist him during the guilt phase. Callahan filed a motion for Judge Monk to recuse himself because he could possibly be called as a witness. Judge Monk denied the motion for the same reasons as before.

On March 11, 1987, Knight requested a psychiatric examination for Callahan. Callahan was admitted to Taylor Hardin on April 16, 1987 and discharged on June 3, 1987. During his stay at Taylor Hardin, Callahan was

examined and interviewed by several individuals. An initial psychological evaluation was done by psychologist Dr. Wilburn Rivenbark. Rivenbark did not do a complete history because one was done when Callahan was admitted in 1982. Callahan told him that when he was 12, a piece of the lawnmower he was working on broke off and knocked him out for four hours. He also talked "somewhat grandiosely" about his "sexual prowess" and the number of woman he had been with. Rivenbark found no evidence of significant thought disorder and diagnosed Callahan with adult antisocial behavior—although he noted there was no evidence Callahan had been an antisocial juvenile—and narcissistic personality disorder.

Dr. Bernard Bryant, a psychiatrist, diagnosed Callahan with adult antisocial behavior. Callahan told Bryant that as a teenager he started using drugs and alcohol and often would become inebriated to the point where he would black out. He also had numerous hospitalizations for work-related accidents and motorcycle crashes. Bryant found him to be of normal intelligence, showing no evidence of psychological abnormality.

Dr. Kamal Nagi, a psychiatrist, diagnosed Callahan with adult antisocial behavior and a history of drug and alcohol abuse. With Nagi, Callahan "talk[ed] freely about different things," including his childhood, his father being an alcoholic, and his mother's drinking. Callahan said he started to drink at the age

31

of 13 and would experience blackouts because he drank so much. He would also sell moonshine for his father because selling moonshine was the family's primary source of income. Nagi saw no signs of mental illness and noted Callahan scored above average on most parts of the competency to stand trial test. Another psychiatrist, Dr. Fe Yumul, also concluded Callahan was competent to stand trial and free of mental illness at the time of the alleged crime. None of the reports contained any references to Callahan or his mother suffering physical abuse.

Callahan again filed a motion for Judge Monk to recuse himself. The motion was discussed at a hearing on March 2, 1987, and at a pretrial conference on July 6, 1987. At the motion hearing, after recounting his interruption of Callahan's interrogation on February 23, 1982, Judge Monk denied the motion, stating: "I know nothing about the facts of the case. I don't know what you could expect me to testify to other than that. Even if I did testify to that I don't see what it shows, number one. Number two, there are other witnesses who know all of the facts of the case."

b. Trial

The State introduced all five of Callahan's statements and offered detailed evidence about how he was advised of his rights and waived his rights before giving each statement. Jimmy Dunagan, Susan Bragg, Fulton Prevost, Donna

Howell, Karen Howell, Fred Lybrand, and Paul Henninger testified to the same effect as they did at the first trial.[13]  Yet, the evidence at the second trial did differ in several respects from the first trial.

Dr. Embry testified that Howell had a bruise on her temple and that her feet had no bruises or scratches consistent with having run through the area of woods where she was found, but he did not state in his medical opinion that Howell could not have run through those woods.  John Case again concluded white duct tape recovered from a window at Callahan's trailer had the same composition, construction, and dimensions as the tape used to bind Howell's hands, but he did not testify about his comparisons of hair and fiber samples.  Roger Morrison stated he examined a vaginal swab from Howell and concluded human seminal fluid was present, but he did not discuss the "secretor" tests he performed.

In addition to identifying Becky's purse, Karen Howell also testified that on February 4 she saw scratches and hand prints on Becky's car from the top of the hood to the grill; she had not seen the marks before that day.  Sergeant Thienes, Kevin Prichard, and Walter Chauncey were not called as witnesses at the second

---

[13]Lybrand and Henninger did not testify in person at the second trial, but their testimony from the first trial was entered into the record.  In Lybrand's case, his testimony was not offered to the jury, but only to the court on the question of the voluntariness of Callahan's statements.

trial. The State introduced the pillow retrieved from Callahan's truck, but not the gun or a description of the blue jeans.

Two new witnesses were called by the State. Gladys Callahan testified she never met Becky Howell and was not at the washerteria or Callahan's mobile home on February 3. Betty Bass, Billy Griffith's wife, testified she did not know Becky Howell and did not introduce her to Callahan.

Callahan called two witnesses in his defense—Gary Callahan, his brother, and Jenny Fordham. Gary Callahan told the jury he had witnessed an argument between Gladys Callahan and Howell at a trailer in Jacksonville in October of 1981. Howell allegedly told Gladys to leave and never come back. Afterwards, Gladys was "a little upset." Gary Callahan said he was unable to describe Howell because it was dark the night he saw her. He explained that he did not testify about the incident at the first trial because the defendant's first attorney did not believe his story. Gary Callahan never told the defendant what happened between Gladys and Becky Howell, nor did he tell the police when they spoke to him.[14]

Jenny Fordham testified that on August 8, 1981, James Callahan and Becky Howell picked her up at the hospital, and the three of them drove around for a few hours looking for Fordham's truck. She described Becky as being 5'5" with dark

---

[14]Gary Callahan later pled guilty to perjury for his testimony in this case.

hair and brown eyes.  In the State's rebuttal, Karen Howell testified Becky had

blue eyes.

The jury again found James Callahan guilty on all counts.

c.      Sentencing—Jury's Recommendation

The State, in its opening argument of the penalty phase, contended four

aggravating factors existed: (1) the capital offense was committed while Callahan

was under sentence of another felony; (2) Callahan had previously been convicted

of a felony involving the use of violence to the person; (3) the capital offense was

committed in furtherance of a rape or kidnapping; and (4) the capital offense in

question was especially heinous, atrocious, or cruel compared to other capital

offenses.  The case put on by the State was nearly identical to the first sentencing:

the State called Forrest Dobbins, who read into the record copies of Callahan's

two convictions for assault with intent to murder.

Callahan called his aunt, Caroline Callahan.  Caroline Callahan said her

family loved James and urged the jury to recommend a sentence of life without

parole.  She noted the defendant's mother could not be at the sentencing hearing

because she was "very, very ill."  We recount in full Knight's closing argument to

the jury:

Ladies and Gentlemen of the jury, I don't think that there's anything that anyone can say that can undo what's been done. But I think sometimes that it's said the handwriting goes and goes and passes on by. I hope you don't think I'm foolish in speaking on behalf of him that he not be sentenced to the electric chair. It may be that you disagree about that. That's all right. I certainly wouldn't want the death of Becky Howell, either. I think that [is the] one thing that has been done that can't be undone. And I would like to ask you to consider his sentence as life without parole, and that he can live out the rest of his life [with] his wrongdoing in his mind. He'll have to live with it. But to me that's—if you talk about punishment, it seems to me that that is punishment that would meet the circumstances. Of course, that is just my opinion. And I would like to ask you to consider it, and I don't fault you if you don't. But I would like to ask for mercy for him in that respect. I guess sometimes mercy is a thing, you know, that somebody's free to have mercy and sometimes see their way to forgive, and I'll agree to do that. A lot of times I'm sure that a lot of the disgust and hatred and such has stayed alive in the Howell family for Jimmy Callahan. I think they're probably not secrets. I don't think that hatred can be wiped out of their hearts or their minds or their lives by recommending the electric chair to Jimmy. Maybe you think it can. I don't see that it does. I think that's something that if we're going to live with it—hatred is sort of like cancer, it eventually consumes the head and heart both. And if that is the basis of the sentencing is hatred I think it wouldn't be the right basis. I recommend to you that isn't. I feel like that if you have any mercy in your hearts you'll see your way to exercise on your minds and I ask you to do so.

The jury recommended a sentence of death.

36

d.     Sentencing—Trial Court's Findings

The trial court found three aggravating factors:  Callahan was under sentence of imprisonment for a felony, i.e., probation;[15] he had previously been convicted of a crime involving the threat or use of violence to the person; and he committed the crime in furtherance of a kidnapping in the first degree.  The court concluded the evidence supported the jury's recommendation and sentenced Callahan to death.

B.     *Procedural History—State Court*[16]

1.     *Direct Appeal*

On direct appeal of his second conviction, Callahan argued Judge Monk erred in denying his motion for recusal.  Callahan's argument was based on Canon 3.C.(1) of the Alabama Canon of Judicial Ethics, which states:

_____

[15]At the first trial, the court found Callahan was *not* under a sentence of imprisonment. We cannot explain the difference, but at the time of Callahan's second trial, the Alabama Court of Criminal Appeals had clearly stated:  "[T]he definition of the term 'under sentence of imprisonment' . . . 'means while serving a term of imprisonment, while under a suspended sentence, *while on probation or parole,* or while on work release, furlough, escape, or any other type of release or freedom while or after serving a term of imprisonment, other than unconditional release and freedom after expiration of the term of sentence.'" *Tarver v. State*, 500 So. 2d 1232, 1251 (Ala. Crim. App. 1986) (quoting Ala. Code § 13A-5-39(7)) *aff'd*, 500 So. 2d 1256 (Ala. 1986).

[16]Callahan raised numerous issues in his direct appeal and in his state and federal petitions for post-conviction relief.  In this recitation of the procedural history of the case, we only address each court's resolution of the issues that are pertinent to this appeal.

(1) A judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned, including but not limited to instances where:

      (a) He has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

      (b) He served as a lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer in the matter, or the judge or such lawyer has been a material witness concerning it.

In making this argument, Callahan stated he "[wa]s in no way accusing the trial judge of bias." Rather, he contended Judge Monk had personal knowledge of disputed facts, such as the demeanor of Callahan and the interrogators, and without being able to call Judge Monk as a witness, "these facts could never be disclosed from an apparently unbiased witness."

Callahan also asserted he was denied the right to "confront the Judge as to his observations at the interrogation which is one of our most fundamental and basic laws known to our land." In support of his claim, Callahan cited the Sixth Amendment to the United States Constitution, Ala. Code § 12-21-137, and several cases. Section 12-21-137 of the Alabama Code gives a defendant the right to cross-examine the witnesses called against him. Similarly, the cases cited by

Callahan dealt with the Confrontation Clause of the Sixth Amendment and a defendant's right to cross-examine an adverse witness.

On appeal to this Court, Callahan argues Judge Monk's failure to recuse himself violated his Sixth Amendment right to present witnesses on his behalf. Although the right to confront is different from the right to compel, Callahan's argument in state court was largely premised on his ability to call Judge Monk as a witness; therefore we will assume he properly raised and exhausted his current argument.

Callahan also now argues he was deprived of his Sixth Amendment right to an impartial tribunal. Not only did Callahan fail to make any constitutional argument in state court related to Judge Monk's bias or appearance of bias, but he explicitly stated he was not making such a claim. Although we will assume Callahan raised this argument in state court, we are compelled to note it is a very close question.

The Alabama Court of Criminal Appeals considered both whether Judge Monk was a material witness and whether Judge Monk acquired knowledge of disputed facts. *Callahan v. State*, 557 So. 2d 1292, 1307–09 (Ala. Crim. App. 1989) (*Callahan II*). As to the first issue, the Court of Criminal Appeals adopted the view of several other states that a "'material witness' is 'a witness who gives

39

testimony going to some fact affecting the merits of the cause *and about which no other witness might testify*.'" *Id.* at 1307–08 (quoting *Wingate v. Mach*, 157 So. 2d 421, 422 (Fla. 1934)). The court noted that Assistant District Attorney Hubbard, who was present in the interrogation room when Judge Monk entered, testified at the suppression hearing, and Lybrand, who entered the interrogation room after Judge Monk's short visit, was available to testify.[17]  *Id.* at 1308. Because other individuals could testify, and did, as to the same events observed by Judge Monk, the Court of Criminal Appeals concluded Judge Monk was not a material witness. *Id.*

The court next examined whether Judge Monk "avoid[ed] losing his impartiality" and "maintain[ed] his unfamiliarity with disputed matters." *Id.* (citations and quotations omitted). The court recounted the description Judge Monk gave at the second trial of what occurred in the interrogation room:

> The entire transaction was judicial in nature. It was in the discharge of my public duty and my duty as a Circuit Judge. I observed nothing factual as far as the taking of the statement. I heard no portions of the statement other than the—a portion of a sentence or so that had no meaning. There's nothing I could testify to that I know of. The events up until the time I knocked on that door are events that could be clearly testified to by Mr. Lybrand. After the time I knocked on that

---

[17]Callahan elected to have Lybrand's testimony read into the record rather than call him again.

door they are a matter of court—or a matter of record having been, I assumed, . . . transcribed by Mrs. Hinds.

*Id.* at 1309. After considering Judge Monk's statement and transcript of what happened in the interrogation room, the Court of Criminal Appeals reached the following conclusion:

It appears that Judge Monk was present in the interrogation room for no more than a few moments. The transcript reflects that, while Judge Monk was present, no questions were put to Callahan regarding Ms. Howell's death, no threats were made to Callahan, nor any rewards offered him. In fact, the only conversation after Judge Monk interrupted was that between Judge Monk and Callahan . . . .

This is not a situation in which the trial judge conducted an independent investigation, became the "fact gatherer as well as a fact finder, and thereby subject[ed] a defendant to an impossible burden," which would necessitate a recusal. Nor is it a situation in which the judge acquired "knowledge *de hors* the record of the truth or falsity of a matter" and later was required to make a credibility determination with regard to conflicting testimony presented on the matter. The conflicting testimony given with regard to Callahan's statements did not concern any events occurring while Judge Monk was in the interrogation room. In this case, the trial judge considered his prior involvement and "state[d] on the record why his impartiality could not reasonably be called into question." The "totality of the facts" did not require Judge Monk's recusal.

*Id.* (internal citations omitted). Callahan's conviction and sentence were affirmed. *Id.* at 1310.

The Alabama Supreme Court, in a one paragraph decision, also affirmed Callahan's conviction and sentence. *Ex parte Callahan*, 557 So. 2d 1311 (Ala.

41

1989).  The United States Supreme Court denied Callahan's petition for certiorari. *Callahan v. Alabama*, 498 U.S. 881, 111 S. Ct. 216 (1990).

2.      *Rule 32 Petition for Post-Conviction Relief*

On September 30, 1992, Callahan filed a petition for post-conviction relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.  Callahan contended he received ineffective assistance of counsel during both the guilt and sentencing phases of his trial.  The State deposed Callahan in preparation for the evidentiary hearing on the Rule 32 motion.

a.      Deposition of James Callahan

Callahan stated his father was often drunk and would hit him, several times knocking him unconscious.  He also witnessed his father abusing his mother and younger brother.  On one occasion, Callahan intervened in a fight between his younger brother and his father, breaking his father's arm with a tire iron and disabling him.

Callahan was asked several questions about the penalty phase of his second trial:  he did not remember discussing the penalty phase with his counsel, Harold Knight; he did not remember wanting his aunt, Caroline, to testify; he did not remember his mother being ill at that time; he did not remember if he gave his counsel names of people he wanted to testify; he did not remember telling his

counsel to talk to any witnesses; and he did not remember his counsel discussing with him the possibility of putting on mental health evidence.

Judge Monk presided over the two-day evidentiary hearing on Callahan's Rule 32 petition held July 1 and 2, 1997. Testimony at the hearing focused on Callahan's claim that Knight was ineffective for failing to investigate and present more mitigating evidence. Because Knight passed away several years before the hearing, he did not testify. Callahan called three witnesses to support his argument: Mary Callahan, Joanne Terrell, and Dr. John Goff. The State called Dr. Karl Kirkland.

> b. Testimony at the Rule 32 Hearing

> i. Mary Callahan

Mary Callahan, the defendant's mother, testified her husband was drunk every day and beat her and raped her "pretty much everyday" of their 44-year marriage; her husband started beating the defendant when he was a toddler. According to her, the defendant often saw her husband beat her and would step between them and try to make him stop. When the defendant tried to intervene, her husband would beat him as well. As a result of being constantly raped and abused, she was destroyed emotionally, which led her to attempt suicide several times. Although she was in and out of hospitals and mental hospitals since 1962, she had

no idea why her records did not mention her husband's physical and sexual abuse. She took medication for her "nerves," and it put her in a zombie-like state.

Regarding her son's trials, she testified neither Wilfred Lane nor Harold Knight contacted her about testifying on her son's behalf. Knight did come to her house once and speak with her husband about the trial, but she let her husband take care of everything related to the trials. Although she admitted to being in a hospital in a "zombie-like state" during the second trial, she would have testified "zombie and all" if asked.

ii.    Joanne Terrell

Joanne Terrell was a clinical social worker, who developed "psychosocial assessments" of individuals.[18] Under state law, she was not authorized to diagnose mental or emotional disorders. In this case, Terrell developed a psychosocial assessment of Callahan. To prepare the assessment, Terrell interviewed Mary Callahan, Sharon Henninger, Paul Henninger, Gary Callahan, Gary's wife (Lisa), Michael Callahan, Michael's wife (Marie), and the defendant's maternal aunt, Helen Hood. Terrell did not interview either of the defendant's ex-wives because

---

[18]A psychosocial assessment, as described by Terrell, involves the accumulation and evaluation of the developmental and behavioral background information of an individual to aid in understanding the impact these envrionmental factors had on the individual's ability to function in society.

44

she did not feel it was important to talk to them. Along with the relevant legal records, she also reviewed the medical and psychiatric records for both Mary Callahan and the defendant.

Terrell recounted her interviews with the defendant's family members. Mary Callahan told Terrell her husband was physically and sexually abusive towards her and that she tried to commit suicide several times. She also said her husband starting beating the defendant when he was two years old. Mary was first admitted to a mental health hospital in 1962, where she was diagnosed with psychotic depression and given electric shock therapy. Sharon Henninger told Terrell that her father beat her mother and James on a regular basis. Sharon said her father began sexually molesting her when she was 11 and continued to molest her until she was 16, when she became pregnant. Sharon also told Terrell that the defendant began drinking at the age of 13 and continued until he was arrested for the present crime. Gary Callahan told Terrell that he was aware his father hit his mother and the defendant.

Terrell's conclusions were based on her belief that an individual's personality is formed by the time they are seven or eight, and that personality will influence how an individual will respond to people. Based on her interviews and review of the records, Terrell concluded Callahan came from an abusive family that

45

did not meet his essential emotional needs. As a result of the environment he grew up in, Callahan was not taught how to control his impulses and how to obey the laws of society. Callahan's drinking exacerbated the problem because it diminished his already low impulse control. On cross-examination, Terrell admitted that Mary Callahan's and James Callahan's medical records did not corroborate any of the accounts of physical or sexual abuse. Despite her conclusion that Harvey and James Callahan were alcoholics, she conceded both were able to maintain steady employment throughout their lives. Terrell was not aware that Gladys Callahan said the defendant had once tried to smother her with a pillow.

### iii. Dr. John Goff

Dr. John Goff, a clinical psychologist, conducted a neuropsychological evaluation of Callahan, assessing his intelligence, cognitive abilities, memory, and personality functions. Goff looked at the medical records from Callahan's 1982 and 1987 psychiatric exams, and talked with Terrell about what the family members told her. Goff did not read the deposition Callahan gave prior to the Rule 32 hearing or interview any family members personally because he could not reach them.

Goff concluded Callahan had a mild cognitive deficit, which caused poor memory skills, and a paranoid personality disorder. Callahan's paranoid personality disorder prevented Callahan from trusting anyone, which led to hostility, suspiciousness, and distorted perceptions. Callahan also had "a tendency . . . towards untruths." Although Goff concluded Callahan had memory problems, he acknowledged Callahan was employed for most of his life, including holding the position of supervisor at some jobs. Goff was not aware of any documentary evidence to support Mary Callahan's claims of physical and sexual abuse. He thought Mary Callahan's testimony that she was raped every day for 44 years to be "possibly an overstatement."

Goff admitted, of all the psychiatrists and psychologists to examine Callahan, only one came close to diagnosing Callahan in the same way he did. When asked why only Callahan's mother testified at the Rule 32 hearing, Goff expressed a belief that some family members probably did not like Callahan. The State also questioned Goff about a Alabama Court of Civil Appeals decision, which referred to his conclusions as "questionable" because they were based on a "narrow investigation" and "incomplete" information. *See In re Bryant*, 485 So. 2d 750, 752–53 (Ala. Civ. App. 1986). Goff agreed that the Court of Civil Appeals had

47

criticized him, but disagreed with its observation that he had available information that he chose not to use.

### iv.    Dr. Karl Kirkland

Dr. Karl Kirkland, a psychologist and assistant professor of medicine, completed a forensic evaluation and psychosocial assessment of Callahan, which included examining Callahan in person and reviewing the medical records of James and Mary Callahan, the District Attorney's file, the trial transcript, and Callahan's deposition.  Kirkland was not able to interview any members of Callahan's family, but did interview Callahan's two ex-wives and a close friend, Ann Payne.  Kirkland spoke with Lucretia Paris, who was married to Callahan from 1969 to the late 1970s.  Paris told Kirkland that Callahan did not have a drug or alcohol problem while they were married, and Callahan was not violent against her until the end of their relationship.  In particular, Lucretia Paris related an incident where Callahan fired a gun into her trailer.  Callahan never told Paris he suffered any physical abuse as a child.  Ann Payne told Kirkland she never perceived Callahan as paranoid or saw him engage in bizarre or inappropriate behavior, but she was aware of the incident where Callahan shot into the trailer.

Kirkland administered IQ and memory tests to Callahan; Callahan scored in the normal range on both.  Kirkland concluded Callahan was suffering from no

mental illnesses that would have detracted from his ability to appreciate the wrongfulness of his actions at the time of the offense. Kirkland further concluded that at the time of both trials, Callahan was competent and able to assist his attorneys. Kirkland also observed that there was evidence showing Callahan tried to cover up the crime, such as hiding evidence, leaving the state, changing his story, and trying to destroy his mobile home—such actions indicated Callahan knew what he did was wrong.

Kirkland disagreed with the Taylor Hardin Reports that diagnosed Callahan as having an antisocial personality. Kirkland believed there might be evidence of an antisocial personality disorder, but he did not think there was one. Finally, Kirkland found no causal connection between the alleged abuse Callahan suffered as a child and the crime he committed, which were separated by 23 years. Like Dr. Goff, Kirkland saw nothing in Mary Callahan's medical records to corroborate her accounts of physical and sexual abuse.

### c. Ineffective Assistance of Counsel—Guilt Phase

Callahan argued his counsel was ineffective during the guilt phase for failing to argue that in light of *Callahan I*, the State did not present sufficient evidence to prove the constitutionality of Callahan's statements. Under Callahan's view of *Callahan I*, the State's introduction of the statements was precluded by Alabama's

49

interpretation of the Double Jeopardy Clause of the United States Constitution.

Relying on *Hull v. State*, 607 So. 2d 369 (Ala. Crim. App. 1992) and *Ex parte Hergott*, 588 So. 2d 911 (Ala. 1991), Callahan argued *Callahan I* was a final judgment on the admissibility of the statements.[19] *Callahan v. State*, 767 So. 2d 380, 386 (Ala. Crim. App. 1999) (*Callahan III*). In rejecting Callahan's argument, the Court of Criminal Appeals observed: "The Alabama Supreme Court's reversal of Callahan's conviction at his first trial was based on trial error, not on evidentiary insufficiency; therefore, Callahan's retrial did not implicate the Double Jeopardy Clause . . . ." *Id.* at 387.

          d.     Ineffectiveness Assistance of Counsel—Penalty Phase

Callahan argued his counsel was ineffective for failing to investigate and present additional mitigating evidence. Specifically, Callahan contended that better investigation would have produced "many family members, friends, and other witnesses" who would have "testified about Mr. Callahan's severely dysfunctional family with no social service intervention, his sexually and physically abusive alcoholic father, his suicidal and chronically depressed passive

---

[19]Without going into unnecessary detail, the gist of *Hull* and *Hergott* is that the State does not get two bites at the apple; if a court finds the State failed to prove the admissibility of evidence, then at a second trial, the State cannot introduce additional evidence to try and prove what it failed to prove the first time.

dependant mother, his history of chronic alcohol abuse, his history of closed head injuries, and his good behavior in and adjustment to prison." *Callahan III*, 767 So. 2d at 398–99 (internal quotations omitted).

The trial court observed that although Callahan alleged many individuals were available to testify on his behalf, only one actually testified at the Rule 32 hearing. For example, Sharon Henninger was under subpoena, but did not honor it. For this reason, the trial court concluded: "Callahan's present counsel was apparently no more successful than trial counsel in having the family members show up and testify for Callahan." The trial court found Joanne Terrell's testimony about Callahan's childhood abuse was not credible for several reasons. First, Terrell just repeated what family members had told her, and therefore, the State was denied an opportunity to cross-examine the family members. If the family members had testified, the trial court noted there was a real possibility their testimony may not have been favorable to Callahan. Second, Terrell's testimony occasionally demonstrated that she was biased to give only favorable testimony about Callahan. In particular, she did not interview either ex-wife because she thought they would be biased against Callahan. As a further indication of Terrell's bias, the court noted she believed everything the family members said despite recognizing their potential motive to make the family situation look worse than it

51

really was.  On the other hand, the trial court credited the testimony of Dr. Kirkland and found whatever the degree of abuse in the Callahan household, it had no causal connection with Callahan's murder of Becky Howell.

The trial court concluded Callahan's counsel was not deficient for failing to present the testimony proffered at the Rule 32 hearing, and even if the evidence had been presented there was not a reasonable probability of a different result at sentencing.  The Court of Criminal Appeals agreed with the trial court's conclusion:  "Callahan presented insufficient evidence to establish that trial counsel was not at least as diligent as counsel at the Rule 32 evidentiary hearing in investigating mitigating evidence." *Callahan III*, 767 So. 2d at 399.  "The evidence that Callahan presented to support this claim was not compelling and, if it had been presented at the penalty phase of the trial, it would not have changed the outcome of the proceedings." *Id*. (internal quotations omitted).

C.    *Procedural History—Federal Court*

On March 29, 2001, Callahan filed a petition for habeas corpus in the Northern District of Alabama, raising a total of nine claims.  *Callahan v. Campbell*, 396 F.3d 1287, 1288 n.1 (11th Cir. 2005) (*Callahan V*) (listing the claims). Callahan's petition was referred to Magistrate Judge Harwell G. Davis III on June 8, 2001.  After the magistrate judge recommended denying Callahan's petition on

all counts, Callahan objected to the magistrate judge's resolution of eight of his nine claims. The district court addressed only two of Callahan's eight objections to the magistrate judge's report, granting relief on both of them. *Callahan v. Haley*, 313 F. Supp. 2d 1252 (N.D. Ala. 2004) (*Callahan IV*). We ordered a limited remand instructing the district court to address the other six claims. *Callahan V*, 396 F.3d at 1288–89.

On remand, the district court denied relief on the six claims not previously addressed and issued a certificate of appealability on a total of four claims—the two original claims on which relief was granted, and two additional claims for which relief was denied. We then ordered the parties to file supplemental briefs on the two heretofore unbriefed claims. Callahan only briefed one of the two "new" claims, thereby waiving the other. Thus, Callahan has three claims that are actually at issue in this appeal: (1) the trial judge's failure to recuse himself violated his constitutional rights; (2) he received ineffective assistance of counsel due to his counsel's failure to object to the admission of his statements based on a prior ruling of the Alabama Supreme Court; and (3) he received ineffective assistance of counsel at sentencing due to his counsel's failure to investigate and present mitigating evidence.

53

1. *Judge Monk's Failure to Recuse Himself*

The district court concluded Judge Monk's failure to recuse himself violated Callahan's Sixth Amendment right to an impartial tribunal and right to present a full and fair defense. Although the district court's analysis of the two grounds for relief is interspersed, the best we can tell is that the district court found Judge Monk impartial because by entering the interrogation room "[he] assumed the role of the prosecutor" and "eschewed his judicial role." *Callahan IV*, 313 F. Supp. 2d at 1264. The district court was troubled by the fact that Judge Monk informed Callahan of his *Miranda* rights and found "even more appalling [] that on *four separate occasions*, in the presence of the district attorney and law enforcement officers, Judge Monk advise[d] [Callahan] that he has a right *not* to talk with the lawyer retained by [Callahan's] father." *Id.* In granting relief on this issue, the district court concluded that "[t]he State Courts' [order] and the Magistrate Judge's R&R do not address the implications of *Tumey* [*v. Ohio*, 273 U.S. 510, 47 S. Ct. 437 (1927)] and [*In re*] *Murchison*[, 349 U.S. 133, 75 S. Ct. 623 (1955)]. Clearly, they are controlling precedents of the United States Supreme Court." *Id.* at 1265.

The district court also concluded Callahan's right to present a full and complete defense was violated because he could not call Judge Monk as a witness. In particular, the district court stated:

54

The judge was certainly a witness to 1) the conditions of the interrogation room, 2) Petitioner's demeanor and mental/emotional state, 3) the appearance of the law enforcement officials in the interrogation room.

If the judge had testified at trial as a witness, and confirmed the testimony of Attorney Lybrand and parts of the testimony of [Callahan], his testimony would likely have carried much more weight than the testimony of other witnesses.

*Id.* at 1264. The district court did not specifically cite any Supreme Court caselaw to support this portion of its holding, but we presume the basis was *Crane v. Kentucky*, 476 U.S. 683, 106 S. Ct. 2142 (1986), which was cited earlier in its opinion for the proposition that "[c]riminal defendants are guaranteed the right to present a complete defense." *Id.* at 1263.

2. *Ineffective Assistance of Counsel—Guilt Phase*

The district court adopted the magistrate judge's report as to Callahan's claim of ineffectiveness assistance of counsel at the guilt phase of his trial. The magistrate judge reached two conclusions. First, the Alabama Supreme Court's decision did not hold Callahan's fifth statement *was* tainted by his prior unlawfully obtained confessions. Rather, the Alabama Supreme Court held the State failed to satisfy its burden to establish that the fifth statement was not tainted. Therefore, Callahan's counsel was not deficient for failing to object to the admission of Callahan's statements on that ground.

55

### 3. *Ineffective Assistance of Counsel—Penalty Phase*

The district court found Callahan's counsel was deficient at sentencing for three primary reasons: (1) Knight failed to call Callahan's mother as a witness; (2) "[t]here [wa]s no evidence that *any* substantial mitigation investigation or strategy was discussed or implemented by defense counsel"; and (3) "[e]qually crucial was the failure of [Callahan's] counsel to present any psychological evidence." *Id.* at 1261–62. In particular, the district court believed evidence should have been presented regarding Callahan's "dysfunctional upbringing, his paranoid personality disorder, and his cognitive defects." *Id.* at 1265. If Callahan's counsel had taken those steps, the district court concluded there was a reasonable probability Callahan would not have been sentenced to death. *Id*.

## II. STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), a federal court's ability to grant a state court prisoner's petition for habeas corpus is limited to three situations.[20] *See* 28 U.S.C. § 2254(d).

First, we can grant relief if the state court decision was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). A state court decision will be contrary to Supreme

---

[20]Callahan's habeas petition was filed well after the effective date of AEDPA.

Court precedent where "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or where "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S. Ct. 1495, 1519–20 (2000). "In applying the 'contrary to' prong of AEDPA, we have recognized that where no Supreme Court precedent is on point, 'we cannot say that the state court's conclusion . . . is contrary to clearly established Federal law as determined by the U.S. Supreme Court.'" *Washington v. Crosby*, 324 F.3d 1263, 1265 (11th Cir. 2003) (citation omitted).

Second, we can grant relief where the state court decision "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). "Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409, 120 S. Ct. at 1521. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal

law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411, 120 S. Ct. at 1522.

Third, § 2254(d)(2) allows for relief where the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(2). Not only must the factual determination have been unreasonable, but the state court's factual findings must be shown unreasonable by clear and convincing evidence.  § 2254(e)(1); *see also Rutherford v. Crosby*, 385 F.3d 1300, 1308 (11th Cir. 2004) (concluding that "[petitioner] has not shown by clear and convincing evidence that the Florida Supreme Court's factual finding . . . [wa]s unreasonable in light of the evidence in the state court record").

## III.  DISCUSSION

After a careful review of the state court record and the relevant Supreme Court caselaw, we conclude that Callahan's habeas petition raises no claims to support relief under AEDPA.

A.     *Judge Monk's Failure to Recuse Himself*

Callahan argues Judge Monk's failure to recuse himself violated his Sixth Amendment right to an impartial tribunal and his Sixth Amendment right to present witnesses.  We discuss each in turn.  Although the district court did not identify

under which prong of § 2254(d) it was granting relief, Callahan asserts he is entitled to relief under § 2254(d)(1) and (d)(2).

1.    *Right to an Impartial Tribunal*

    a.    § 2254(d)(2)

Callahan first challenges the Alabama Court of Criminal Appeal's factual finding that Judge Monk did not participate in his interrogation. However, other than simply concluding Judge Monk participated, the only factual support Callahan provides for his claim is Judge Monk's statements that he knew Callahan had been read his rights and he knew he had waived his right to an attorney. Callahan supposes Judge Monk learned this information from the prosecution and from that supposition extrapolates that Judge Monk was involved in the investigation. The record belies Callahan's assertions because we know why Judge Monk said what he said. Wilfred Lane specifically asked Judge Monk how he knew Callahan had been read his rights, and Judge Monk replied it was merely an assumption. Judge Monk also stated on the record it was Lybrand who told him initially that Callahan had waived his right to an attorney. This makes sense, considering Lybrand persuaded Judge Monk to intercede on his behalf because the Sheriff was using Callahan's waiver of counsel to deny him access to Callahan during the interrogation.

59

Judge Monk did not obtain information about the investigation before entering the interrogation room, and he did not participate in the investigation when he entered the room—not a single question was posed to Callahan by Judge Monk that was remotely related to the investigation. We have found no support in the record for the district court's finding that Judge Monk "assumed the role of the prosecutor." *See Callahan IV*, 313 F. Supp. 2d at 1264. The state court's factual finding was not unreasonable.

Callahan also argues the state court's decision[21] that Judge Monk remained impartial was based on an unreasonable determination of the facts. Callahan contends the state court's ultimate factual determination—the finding that Judge Monk did not obtain extrajudicial knowledge pertaining to disputed facts surrounding his interrogation on February 23—is unreasonable. Specifically, Callahan challenges some of the subsidiary factual determinations, claiming that by entering the interrogation room and speaking with Callahan, Judge Monk acquired knowledge of three factual issues which were in conflict at the suppression hearing: whether Callahan was offered food or drink on February 22 and 23; whether Callahan's physical condition during the interrogation was impaired due to lack of

---

[21] We may only grant habeas relief under § 2254(d)(2) where "the adjudication of the claim . . . resulted in a *decision* that was *based* on an unreasonable *determination of the facts* in light of the evidence presented in the State court proceeding." (emphasis added).

60

sleep; and whether a deputy sheriff threatened Callahan by placing a pistol on the table during the interrogation.

The court's factual determination was based on several pieces of evidence. First, "the entire conversation during the judge's presence in the interrogation room was, in fact, recorded and later transcribed by the court reporter as part of the statement." *Callahan II*, So. 2d at 1309. Second, "[t]he entire transaction was judicial in nature," *id.* (quoting Judge Monk's statement), and not extrajudicial in nature. Indeed, Judge Monk's involvement was at the behest of counsel retained by Callahan's father. Third, "[t]he conflicting testimony given with regard to Callahan's statements did not concern any events occurring while Judge Monk was in the interrogation room." *Id.* In particular, the alleged pistol incident was not alleged to have happened while Judge Monk was in the room. Fourth, "Judge Monk was present in the interrogation room for no more than a few moments." *Id.* Implicit in the state court's observation is that, although Judge Monk did speak with Callahan, he did not spend enough time with him to form any conclusions as to his demeanor or physical state. The transcript also supports such a conclusion. Fifth, the state court's review of the transcript revealed that "while Judge Monk was present, no questions were put to Callahan regarding Ms. Howell's death, no threats were made to Callahan, nor any rewards offered him." *Id.*

61

We cannot say the state court's decision was based on an unreasonable determination of the facts in light of all the evidence before it. § 2254(d)(2).

b.     § 2254(d)(1)

We now consider whether the state court's application of law to fact was "contrary to" or an "unreasonable application of" Supreme Court precedent.[22]  The only Supreme Court case cited by Callahan addressing when a judge cannot preside over a matter, i.e., must recuse, is *In re Murchison*.  349 U.S. 133, 75 S. Ct. 623 (1955).  *Murchison* involved a Michigan law that allowed a judge to act as a "one-man grand jury," but prohibited judges who were one-man grand juries from then hearing any cases arising from their inquiries.  *Id.* at 133–35, 75 S. Ct. at 624–25.  There, a state court judge called as witnesses two individuals, Murchison and White, as part of a grand jury inquiry he was conducting.  *Id.* at 134, 75 S. Ct. 624.  White refused to answer any questions on the ground that he was entitled to have an attorney present during questioning.  *Id.* at 134–35, 75 S. Ct. 624–25.  Murchison testified, and the judge charged him with perjury and ordered him to show cause why he should not be held in contempt.  *Id*. at 134, 75 S. Ct. at 624.  The judge then tried, convicted, and sentenced them in open court for contempt.

---

[22]As discussed earlier, we will assume Callahan made an argument based on his Sixth Amendment right to an impartial tribunal in state court.

*Id.* at 135, 75 S. Ct. at 625. They objected, arguing a trial before a judge "who was at the same time the complainant, indicter and prosecutor, constituted a denial of the fair and impartial trial required by the Due Process Clause of the Fourteenth Amendment . . . ." *Id.*, 75 S. Ct. at 625. The trial judge answered that due process did not forbid him from trying contempt charges. *Id.* at 135–36, 75 S. Ct. at 625. The Supreme Court reversed, stating:

> A fair trial in a fair tribunal is a basic requirement of due process. . . . To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. . . . It would be very strange if our system of law permitted a judge to act as a grand jury and then try the very persons accused as a result of his investigations.

*Id.* at 136–37, 75 S. Ct. at 625. Callahan interprets *Murchison* as holding that "when a judge's participation in a case allows the judge to acquire extrajudicial knowledge that directly relates to issues over which the judge is presiding, recusal is required because it is difficult if not impossible for a judge to free himself from the influence of what took place."

In *Johnson v. Carroll*, 369 F.3d 253 (3d Cir. 2004), the Third Circuit was asked to read *Murchison* as holding that the appearance of bias violated the Due Process Clause. Rejecting such an interpretation, the court stated: "[*Murchison*'s] holding, as opposed to dicta, is confined to the basic constitutional principle of

63

prohibiting a judge from adjudicating a case where he was also an investigator for the government." *Id.* at 260. We agree. Judge Monk was not an investigator for the government; therefore, *Murchison* is not on point. The state court's rejection of Callahan's claim based on Judge Monk's failure to recuse himself was not "contrary to" or an "unreasonable application of" clearly established Supreme Court precedent.

2. *Right to Present Witnesses*

Although he did not use these terms, Callahan's claim is essentially an allegation that his rights under the Compulsory Process Clause of the Sixth Amendment have been violated because he was prevented from calling Judge Monk as a witness. Unlike most Sixth Amendment rights, which "arise automatically on the initiation of the adversary process," the right of a defendant to compulsory process is "dependant entirely on the defendant's initiative." *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S. Ct. 646, 653 (1988) ("The decision whether to employ [compulsory process] in a particular case rests solely with the defendant.").

After a thorough review of the record, we cannot find where Callahan actually attempted to call Judge Monk as a witness, either at the suppression hearing or at the second trial. The only reference to Judge Monk testifying was in Callahan's motion to recuse in which he stated Judge Monk could "possibly" be

64

called as a witness. In fact, when Callahan's motion to recuse was discussed at a pre-trial conference on July 6, 1987, Callahan focused his argument on Judge Monk's ability to be impartial—not his desire to call Judge Monk as a witness. Conversely, at the first trial, Callahan explicitly attempted to call Judge Monk as a witness.

The issue is thus whether Callahan's motion to recuse was a sufficient attempt to employ compulsory process such that Judge Monk's denial of the motion was a denial of a request to call him as a witness. Although we are inclined to think it was not, neither party, nor the state court, addressed it, so we will assume Callahan was denied his request to have Judge Monk testify.

a.       § 2254(d)(2)

Assuming Callahan did attempt to call Judge Monk as a witness, Callahan challenges the state court's factual finding that Judge Monk did not observe anything in the interrogation room that could not have been testified to by another witness. It is not enough for Callahan to claim that because he did not have an opportunity to question Judge Monk, he does not know what Judge Monk may or may not have known. The burden is on Callahan to show by clear and convincing evidence that Judge Monk possessed information unknown to any other witness. Yet, Callahan does not contest the fact that several individuals were in the room the

entire time Judge Monk was present, nor does he contest the fact that Lybrand entered the room immediately after Judge Monk. At the second trial, Hubbard testified, and Lybrand was available to testify, but Callahan chose to have his testimony from the first trial read into the record instead of calling him again. Because at least two individuals knew as much as Judge Monk, the state court's factual finding was not unreasonable.

         b.     § 2254(d)(1)

Callahan contends a long line of Supreme Court cases establish his right to present witnesses on his behalf, and the state court's decision is "contrary to" and an "unreasonable application" of them. The Supreme Court cases he relies on are *Crane v. Kentucky*, 476 U.S. 683, 106 S. Ct. 2142 (1986), *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038 (1973), *Taylor v. Illinois*, 484 U.S. 400, 108 S. Ct. 646 (1988), and *Washington v. Texas*, 388 U.S. 14, 87 S. Ct. 1920 (1967). On a very high level of generality, Callahan is correct: those cases do address a defendant's right to present witnesses. However, just because a Supreme Court opinion refers to a defendant's right to call witnesses does not necessarily mean that case is "on point" for all future cases involving asserted rights under the Sixth Amendment. Callahan must point to a Supreme Court case addressing a situation similar to his, and he has not done so.

66

In *Crane*, the trial court found the defendant's confession was voluntary, but the defendant still wished to introduce evidence of the circumstances of the confession to "cas[t] doubt on its validity and its credibility." 476 U.S. at 685–86, 106 S. Ct. at 2144 (internal quotations omitted). The trial court denied the defendant's request and prevented him from introducing *any* evidence about the duration of the interrogation or the individuals who were in attendance. *Id.*, 106 S. Ct. at 2144. Reversing, the Supreme Court observed that the circumstances surrounding the making of a confession are often relevant not only to its voluntariness, but also to its credibility. *Id.* at 688, 106 S. Ct. at 2145. Because of the blanket exclusion of testimony about the circumstances of the confession, the defendant was deprived of a fair trial. *Id.* at 690, 106 S. Ct. at 2146.[23]

In this case, the issue is not whether Callahan was able to introduce evidence about the circumstances of the interrogation: Hubbard and Lybrand both testified about what they saw. The issue is whether Callahan should have been allowed to call Judge Monk as a witness, despite the availability of other witnesses who saw as much as Judge Monk did. *Crane* is not on point.

---

[23]The Supreme Court did not explicitly ground its holding on a specific constitutional right. *Crane*, 476 U.S. at 690, 106 S. Ct. at 2146 ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Clause or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (quotations and citations omitted).

In *Chambers*, the Supreme Court again included general language about the right of a defendant to call witnesses, 410 U.S. at 294, 93 S. Ct. at 1045 ("The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process."), but the actual holding does not resemble the case at bar. There, an individual, Gable McDonald, gave a sworn confession that he was responsible for the murder Leon Chambers was charged with committing. *Id.* at 287, 93 S. Ct. at 1042. McDonald later repudiated the confession. *Id.* at 288, 93 S. Ct. at 1042. Chambers called McDonald as a witness but was kept from cross-examining him because Mississippi's "voucher" rule prevented a party from impeaching his own witness, unless the witness was adverse, and the trial court ruled McDonald was not adverse. *Id.* at 291, 295–96, 93 S. Ct. at 1043–44, 1046.[24] The trial court also prevented, on hearsay grounds, Chambers from calling several friends of McDonald who heard him confess. *Id.* at 298, 93 S. Ct. at 1047. The Supreme Court held Chambers' due process rights were violated. *Id.* at 302, 93 S. Ct. at 1049. Here, Callahan was not prevented from cross-examining a witness, nor was he prevented from introducing any hearsay evidence. *Chambers* is not on point.

---

[24]The idea behind the voucher rule was that the party who called a witness vouched for his credibility. *Chambers*, 410 U.S. at 295–96, 93 S. Ct. at 1046.

68

*Taylor* contains the same general language as *Chambers* about a defendant's right to call witnesses in his defense, 484 U.S. at 408, 108 S. Ct. at 652 ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."), but in *Taylor*, the appeal stemmed from the trial court's exclusion of a defense witness as a sanction for failing to disclose the witness' identity during discovery. *Id.* at 401–02, 108 S. Ct. at 649. The Supreme Court held that while the Sixth Amendment *could* be violated by precluding testimony of a defense witness as a sanction for a discovery violation, there was no absolute bar to preclusion. *Id.* at 409–10, 108 S. Ct. at 653. The Court actually affirmed the trial court's decision to preclude the witness from testifying as a sanction. *Id.* at 416, 108 S. Ct. at 657. If anything, *Taylor* hurts Callahan's cause because it demonstrates the right of a defendant to present witnesses is not absolute. *Taylor* is not on point.

In *Washington*, the witness that the defendant wished to call was prevented from testifying by state law because he had been convicted as a participant in the same crime. 388 U.S. at 16–17, 87 S. Ct. at 1922. The justification for a rule that prevented co-defendants from testifying at each other's trials was that "each would try to swear the other out of the charge." *Id.* at 21, 87 S. Ct. at 1924 (internal quotations omitted). In holding the statute violated Washington's Sixth Amendment right to compulsory process, the Supreme Court did not hold a

69

defendant could *never* be prevented from calling *any* witness. *See id.* at 23, 87 S. Ct. 1925. The state statute violated the Constitution because it was an "arbitrary rule[] that prevent[ed] [a] whole categor[y] of defense witnesses from testifying on the basis of a priori categor[y] that presume[d] them unworthy of belief." *Id.* at 22, 87 S. Ct. at 1925. Here, Alabama has not prevented Callahan from calling an entire category of possible witnesses, e.g., judges. *Washington* is not on point.

In actuality, the rule Callahan wants us to apply is one where the defendant has a right to call his preferred witness, as he states in his brief: "Mr. Callahan's ability to present the judge as a witness was critical because he was the only witness to the interrogation who was not employed by the prosecution." The district court appears to have agreed: "[Judge Monk's] testimony would likely have carried much more weight than the testimony of other witnesses. His refusal to recuse himself deprived [Callahan] of that opportunity." *Callahan IV*, 313 F. Supp. 2d at 1264. Callahan provides no support, Supreme Court or otherwise, for the proposition that the Sixth Amendment gives him a right to call a witness not employed by the prosecution or a witness he perceives as most credible. Accordingly, the state court's decision on this issue was not contrary to or an unreasonable application of Supreme Court precedent.

70

B.    *Ineffective Assistance of Counsel—Guilt Phase*

The two prong test for ineffective assistance of counsel is well-known. "First, the defendant must show that counsel's performance was deficient." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). "Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*, 104 S. Ct. at 2064.

Callahan claims his counsel was deficient for failing to argue that, based on the Alabama state courts' interpretation of the Double Jeopardy Clause in *Hull* and *Hergott*, the holding of *Callahan I* precluded the introduction of all of his statements at his second trial.  The Court of Criminal Appeals concluded Callahan's claim relied on an erroneous interpretation of *Callahan I* and rejected it. *Callahan III*, 767 So. 2d at 386–87.

Callahan's argument that the state court unreasonably applied *Strickland* obviously depends upon our determining Knight's performance was deficient, but first we would have to conclude the state court misinterpreted state law, i.e., misinterpreted *Callahan I*.  In *Herring v. Secretary, Department of Corrections*, 397 F.3d 1338 (11th Cir. 2005), we addressed a similar issue.  There, petitioner argued his counsel was ineffective for failing to make an objection, based on state

71

law, to the introduction of non-statutory aggravating evidence at the penalty phase of his trial; the Florida Supreme Court concluded such an objection would have been overruled and therefore counsel was not deficient. *Id.* at 1354–55. We held: "The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done . . . . It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'" *Id.* (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997).

Here, as in *Herring*, the Alabama Court of Criminal Appeals has already answered the question of what would have happened had Knight objected to the introduction of Callahan's statements based on *Callahan I*, *Hull*, and *Hergott*—the objection would have been overruled. *Callahan III*, 767 So. 2d at 386–87. Therefore, Knight was not ineffective for failing to make that objection.

Moreover, we are convinced Callahan could not satisfy the prejudice prong of *Strickland*. Callahan's ability to demonstrate prejudice is again foreclosed by the state court's decision in *Callahan III*. Even if Knight was ineffective for failing to make the objection, the state court has told us that if he did make the objection it

72

would not have been successful. Callahan cannot be prejudiced by his counsel's failure to make a losing objection.

C.     *Ineffective Assistance of Counsel—Penalty Phase*

Callahan argues Knight was ineffective for three primary reasons: (1) he failed to call his mother as a witness; (2) he failed to present evidence of his mental health; and (3) he failed to present evidence of the physical abuse he suffered as a child. If this evidence had been presented, Callahan contends there is a reasonable probability the jury would have recommended a sentence of life in prison. We conclude Callahan has not shown the state court's application of *Strickland*, on either the performance or prejudice prong, was unreasonable.

1.     *Deficient Performance*

Before addressing his claim, it will be useful for us to first discuss in greater detail how we apply the performance prong of *Strickland*. When examining a claim of ineffective assistance of counsel, we "must indulge [the] strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgement." *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc) (citations and internal quotations omitted). "[W]here the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have

73

done, and that he exercised reasonable professional judgement." *Id.* at 1314 n.15

(quoting *Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir. 1999)). We "must

avoid using 'the distorting effects of hindsight' and must evaluate the

reasonableness of a counsel's performance 'from counsel's perspective at the

time.'" *Id.* at 1316 (citation omitted).

A habeas petitioner bears the burden of proving counsel's performance was

ineffective and that burden is "a heavy one." *Id.* at 1314–15 & n.15. "[P]etitioner

must establish that no competent counsel would have taken the action that his

counsel did take." *Id.* at 1315. The presumption of reasonableness is even stronger

when we are reviewing the performance of an experienced trial counsel. *Id.* at

1316.[25]

Concerning what constitutes reasonable investigation, "counsel need not

always investigate before pursuing or not pursuing a line of defense. Investigation

(even a nonexhaustive, preliminary investigation) is not required for counsel

reasonably to decline to investigate a line of defense thoroughly." *Id.* at 1318

(citing *Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2066). In this context,

---

[25]At the time of Callahan's second trial, according to Louis Wilkinson, Knight had practiced law in Birmingham, Alabama for over twenty years. Wilkinson also testified that he did not think Knight's practice consisted of more than 80% criminal work. An attorney need not limit himself to *only* criminal cases in order to be considered an experienced defense lawyer in a capital case: Wilkinson never stated Knight was not an experienced criminal defense lawyer.

"evidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims." *Id.* (citing *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066). "Once we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced." *Rogers v. Zant*, 13 F.3d 384, 388 (11th Cir. 1994).

Because Knight passed away before the Rule 32 hearing, we have no evidence of what he did to prepare for the penalty phase of Callahan's trial.[26] In a situation like this, we will presume the attorney "did what he should have done, and that he exercised reasonable professional judgment." *Williams*, 185 F.3d at 1228. Therefore, we will presume the following: Knight reviewed the relevant legal documents, James Callahan's medical and psychological records, and Mary Callahan's medical records; Knight questioned the family and friends of Callahan, particularly the ones who testified at the trial, about possible mitigating evidence; and Knight and the defendant discussed what mitigation evidence to present at the penalty phase. The burden is on Callahan to prove Knight did not take these steps.

---

[26]Knight hired Wilkinson to assist him only with the guilt phase of the trial. Wilkinson, with Callahan's permission, left the courtroom before the penalty phase began. Wilkinson testified Knight did not discuss his preparation for the penalty phase with him.

### a. Failure to Call His Mother as a Witness

During the second trial, by her own admission, Mary Callahan was in the hospital being treated for her nerves and was in a "zombie-like" state. Although she states she would have testified "zombie and all" if she had been asked—and we do not doubt her commitment to her son—it was not unreasonable, or even surprising, that Knight did not call her as a witness given her mental condition.

### b. Failure to Present Mental Health Evidence

Inherent in Callahan's argument that Knight was ineffective for failing to present evidence of his mental health is a contention that Knight should have known about his mental health problems. Therefore, we consider whether Knight's investigation into Callahan's mental health was reasonable.

At the beginning of the penalty phase, Knight knew that Callahan had been examined in 1982 and 1987, the latter at Knight's request, for a total of three months by no less than six psychiatrists, two psychologists, and a psychiatric social worker—none of whom reported Callahan as having any mental health problems. To the contrary, everyone who examined Callahan found him to be of normal intelligence. Knight also knew that Callahan's previous counsel did not present any evidence of mental health problems at the penalty phase of the first trial, and there is no evidence Callahan ever told Knight about his mental health problems.

76

Although Callahan does not specifically say what Knight should have done differently, we assume he would have had Knight hire an independent expert to examine Callahan. "[C]ounsel is not required to seek an independent evaluation when the defendant does not display strong evidence of mental problems." *Holladay v. Haley*, 209 F.3d 1243, 1250 (11th Cir. 2000). In *Holladay*, we found counsel's decision not to seek an independent examination reasonable in part because the defendant had spent over a month at Taylor Hardin Medical Facility, had been examined by several mental health experts, and had not been diagnosed with any mental health problems. *Id.* at 1251; *see also Funchess v. Wainwright*, 772 F.2d 683, 689 (11th Cir. 1985) (concluding counsel acted reasonably in not investigating defendant's psychological problems, where the defendant did not tell counsel of past psychological problems, defendant acted competently in assisting counsel at trial, and defendant's pre-trial psychological exam did not suggest past problems). Given what Knight knew, it was reasonable for him not to conduct any further investigation into Callahan's mental health, and obviously, he was not ineffective for failing to present evidence of what he did not know.

c.      Failure to Present Evidence of Childhood Abuse

As with Callahan's mental health problems, we must first conclude Knight should have known about the abuse suffered by Callahan before we can find him ineffective for failing to present it.  Especially when it comes to childhood abuse, "[i]nformation supplied by a petitioner is extremely important in determining whether a lawyer's performance is constitutionally adequate." *Van Poyck v. Florida Dep't of Corr.*, 290 F.3d 1318, 1325 (11th Cir. 2002).  This Court has already stated in no uncertain terms:  "An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him." *Williams*, 185 F.3d at 1237.

When we place ourselves in Knight's shoes at the time of the trial, it was reasonable for him not to investigate the possibility Callahan was abused as a child.  First and foremost, Callahan has presented no evidence that he told Knight about the abuse or that Knight *did not* ask him whether he had been abused.  In Callahan's psychiatric records, both Callahan and his mother discuss his youth in great detail, e.g., when he started to walk and talk and his dating prowess, but there are no references to the physical abuse that he and his mother allegedly suffered at the hands of his father.  Callahan's mother actually said she was the one who had to discipline the children because Callahan's father was away from home so much.

78

Callahan did talk about his father's drinking and mentioned a "strained" relationship with his father, yet alcohol abuse in and of itself is not an indication of physical abuse, not to mention that Callahan stated he cured his father of his drinking. Moreover, there was no indication Callahan and his father did not currently have a good relationship: Callahan was staying at his father's house when he was arrested; his father hired Lane to represent him at his first trial; and his father hired Knight to represent him at his second trial. And Knight knew Callahan's previous counsel had not presented evidence of childhood abuse. At the first trial, Callahan's aunt and uncle stated they had known Callahan all of his life, and despite the fact they spent a great deal of time with him when he was growing up, neither one mentioned physical abuse. Nor would Knight have been alerted to Callahan's history of abuse from reviewing his mother's voluminous medical records. At the Rule 32 hearing, Callahan's own expert testified nothing in Mary Callahan's medical records corroborated her Rule 32 testimony.

Callahan analogizes the failure of Knight to discover evidence of his abuse to the failures in *Williams v. Taylor* and *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527 (2003), but he overlooks a glaring difference—the evidence of abuse in *Williams* and *Wiggins* was documented extensively in public records. *See Wiggins*, 539 U.S. at 523–25, 123 S. Ct. at 2536–37 (In addition to the PSI, in which

79

Wiggins described his youth as "disgusting," social services records revealed "[Wiggins'] mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food."); *Williams*, 529 U.S. at 395, 120 S. Ct. at 1514 (An investigation "would have uncovered extensive records graphically describing Williams' nightmarish childhood."). Here, it was not as if there was an absence of records, between the defendant's psychiatric records and his mother's medical records there was ample documentation of Callahan's childhood. The problem is none of it referenced any abuse. For all of the aforementioned reasons, Knight acted reasonable in not investigating further the possibility of Callahan suffering abuse as a child.

We also address Knight's performance at the penalty phase generally. This Court has repeatedly stated that "[n]o absolute duty exists to introduce mitigating or character evidence." *Chandler*, 218 F.3d at 1319. "Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others." *Id.* In this case, we know from Knight's closing argument at the penalty phase that he focused on mercy. *See Housel v. Head*, 238 F.3d 1289, 1295 (11th Cir. 2001) ("[Counsel] could reasonably decide, given the heinousness of this crime and

80

Housel's confession to it, that in the cultural climate of Gwinnett County in the 1980s, remorse was likely to play better than excuses."); *Williams*, 185 F.3d at 1228 (observing "where the record is incomplete or unclear about [counsel]'s actions, we will presume . . . he exercised reasonable professional judgment."). When we place ourselves in Knight's position, which we must, we see the following: overwhelming evidence that his client committed a premeditated kidnapping, rape, and murder of a random victim, including a confession to the kidnapping and rape in which he concocted a prior sexual relationship with the victim and insinuated his ex-wife was the real murderer; his client's last two wives left him, in part, because he was physically abusive; his client had two previous convictions for assault with intent to murder, one of which arose from when he shot his own 11-year-old niece in the foot; his client's past included no compelling mitigation evidence, such as mental health problems or physical abuse; and his client had already once been sentenced to death for the murder of Howell in the absence of his most damaging statements. Given the hand Knight was dealt, we cannot say a decision to focus on mercy instead of mitigation was an unreasonable one.

2.     *Prejudice*

In order to meet the prejudice prong of the *Strickland* test, the defendant must show there is a reasonable probability that the outcome of the proceeding would have been different. *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, 104 S. Ct. at 2068. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693, 104 S. Ct. at 2067. When a defendant challenges a death sentence, we "evaluat[e] the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—[and] reweigh[] it against the evidence in aggravation." *Hall v. Head*, 310 F.3d 683, 701 (11th Cir. 2002) (internal quotations omitted).

We begin by reviewing the mitigation evidence offered at the Rule 32 hearing. Joanne Terrell testified members of Callahan's family told her Callahan, as well as his mother, was physically abused by his father. Terrell concluded Callahan's history of abuse prevented him from controlling his impulses. The state court, for several reasons, made a factual finding that Terrell's testimony was not credible. Terrell did not state why the family members with whom she spoke would not testify at the hearing, and as a result of the family members not

82

testifying, the state was prevented from cross-examining them. If the state had been able to cross-examine them, their testimony may not have been as favorable to Callahan as portrayed by Terrell. The state court also found Terrell's testimony biased. Although she was preparing a psychosocial assessment and would presumably have wanted to gather as much information as possible about Callahan, she failed to interview Callahan's ex-wives. If Terrell was interested in getting a true sense of who Callahan was, it is not unreasonable to think she would want to talk to the two people with whom he spent most of the last 15 years before the crime. The state court was further troubled by the fact that Terrell believed everything the family members told her, despite their motive to make their family situation look worse than it was. We cannot say the state court's finding was unreasonable.[27]

On the other hand, the state court credited the testimony of Dr. Kirkland regarding Callahan's mental health and childhood abuse. Dr. Kirkland placed great importance on Callahan's psychiatric records—no doctor at Taylor Hardin

_____

[27]Callahan argues the state court found Terrell not credible because it was operating under a "fundamental misunderstanding of the law of mitigation." He continues: "[d]efense counsel is under no obligation to seek out *un*favorable or aggravating evidence . . . ." Callahan is correct. "Defense counsel" is under no obligation to seek out unfavorable evidence, but it was not defense counsel who was found not credible. The individual in question was an expert witness who was holding herself out as an objective evaluator. The state court did not find fault with her for not seeking out unfavorable evidence; the state court faulted her for not seeking out all possible evidence.

diagnosed Callahan with a mental illness or defect—because the doctors who made those records were able to observe Callahan for a much longer period of time than the experts, himself included, who testified at the Rule 32 hearing. Dr. Kirkland also concluded that whatever degree of abuse Callahan suffered as a child it had no causal connection with the crime Callahan committed.[28]

The only firsthand account of the abuse Callahan suffered was by his mother. We would be remiss to not acknowledge the potential credibility issues accompanying Mary Callahan's testimony. Although she spoke of years of abuse by Callahan's father, she had no answer as to why her medical records did not contain any reference to the abuse. She also did not explain why she did not mention the abuse her son suffered when she was interviewed for his psychiatric evaluation in 1982. The State could have further called into question her credibility by pointing out her long history of mental health problems. Finally, we

---

[28]Callahan interprets the trial court's crediting Dr. Kirkland's testimony as requiring Callahan to show a causal connection between his abuse and the crime in order to demonstrate prejudice, which is "contrary to" *Strickland*. Callahan's interpretation is without support. The trial court and the Court of Criminal Appeals both cited and applied a reasonable probability standard to determine if there was prejudice. *See Callahan III*, 767 So. 2d at 400. Moreover, under § 2254(d)(1), "we review the state court's 'decision' and not necessarily its rationale," *Parker v. Sec'y for Dep't of Corr.*, 331 F.3d 764, 785 (11th Cir. 2003), in order to avoid a "'grading papers' approach that is outmoded in the post-AEDPA era," *Wright v. Sec'y for Dep't of Corr.*, 278 F.3d 1245, 1255 (11th Cir. 2002).

cannot forget that all of her testimony at the penalty phase would have been offered while she was in a zombie-like state.

It is unlikely Dr. Goff's conclusions about Callahan's mental health would have carried much weight with the jury either. Most notably, after only examining Callahan for less than a day, Dr. Goff diagnosed him differently than the six psychiatrists who previously had access to Callahan for at least a month. On cross-examination, the State brought out that, despite diagnosing Callahan with memory loss, Goff did not read Callahan's deposition (less than 150 pages) in which Callahan would have obviously been questioned at length about the past. The State also noted Dr. Goff had been criticized by the Alabama Court of Civil Appeals for basing his conclusions on a narrow investigation and incomplete information.

The mitigation evidence offered at the Rule 32 hearing primarily concerned physical abuse Callahan suffered as a child, yet Callahan was 35 when he committed the crime. When a defendant is several decades removed from the abuse being offered as mitigation evidence its value is minimal. *See Francis v. Dugger*, 908 F.2d 696, 703 (11th Cir. 1990) (according "little, if any, mitigating weight" to evidence of a deprived and abusive childhood where defendant was 31 years old when he committed the murder). Terrell also admitted that, to her knowledge, none of Callahan's siblings had committed violent crimes, further

85

reducing the value of abuse as mitigating evidence. *See Grayson v. Thompson*, 257 F.3d 1194, 1227 (11th Cir. 2001) ("The fact that Grayson was the only child to commit such a heinous crime also may have undermined defense efforts to use his childhood in mitigation."). Overall, the mitigation evidence offered on Callahan's behalf was less than compelling.

On the other hand, the state court found three aggravating factors: the crime was committed while Callahan was under sentence of imprisonment; the defendant had been previously convicted of a crime of violence; and the murder was committed during a kidnapping. We have previously noted that "[m]any death penalty cases involve murders that are carefully planned, or accompanied by torture, rape or kidnapping." *Dobbs v. Turpin*, 142 F.3d 1383, 1390 (11th Cir. 1998) (alteration in original) (quotations omitted). "In these types of cases, this court has found that the aggravating circumstances of the crime outweigh any prejudice caused when a lawyer fails to present mitigating evidence." *Id.* While that is obviously not an absolute rule, it demonstrates the burden a defendant faces when trying to overcome such harsh aggravating factors with mitigating evidence. *See Clisby v. Alabama*, 26 F.3d 1054, 1057 (11th Cir. 1994) ("[S]ometimes the *best* lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder—or, even, a less brutal murder for which

86

there is strong evidence of guilt in fact."); *see also Crawford v. Head*, 311 F.3d 1288, 1321 (11th Cir. 2002) (finding no prejudice in part because of the "strength of the evidence both of Crawford's guilt and of the aggravating circumstances"). The evidence that Callahan kidnapped, raped, and murdered Becky Howell was overwhelming; we need not recount it again.

We must remember that our role is not to determine whether we think the state court correctly concluded Callahan was not prejudiced; we are only concerned with whether the state court's conclusion was unreasonable. After reweighing the aggravating and mitigating evidence, we cannot say the state court unreasonably applied the prejudice prong of *Strickland*.

## IV.  CONCLUSION

James Callahan has produced no evidence that his constitutional rights were violated at either the guilt or penalty phase of his trial. His petition for habeas corpus is therefore denied on all counts.

AFFIRMED IN PART AND  REVERSED IN PART.

WILSON, Circuit Judge, concurring:

Judge Monk's decision to step across the threshold of the interrogation room and speak with Callahan, out of court, seems unusual to me. It is not surprising that no case presenting materially the same facts has ever reached the Supreme Court. Yet, lacking any Supreme Court decision saying so, the state court's decision denying relief on the recusal claim is not, under the standards set forth by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), contrary to or an unreasonable application of clearly established federal law. Therefore, I agree that the district court erred in granting habeas relief on the ground that Judge Monk's failure to recuse himself denied Callahan a fair trial.

As to the second issue, I agree with the court's analysis in denying Callahan relief on his ineffective assistance of counsel claim during the guilt-phase of the proceeding. Whether Callahan was denied the effective assistance of counsel during the penalty-phase is a somewhat more difficult proposition, since Callahan's penalty-phase lawyer had died by the time of the post-conviction hearing. Consequently, there is no evidence regarding any preparation he did for the mitigation effort. There is no evidence that he performed any substantial investigation into Callahan's background, or attempted to call family members other than Callahan's aunt. Following *Chandler v. United States*, 218 F.3d 1305

88

(11th Cir. 2000) (en banc), we "presume that he did what he should have done, and that he exercised reasonable professional judgment". *Id.* at 1314 n.15 (quoting *Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir. 1999)). In *Wiggins v. Smith*, 539 U.S. 510 (2003), defense counsel investigated Wiggins youth, were aware of his background, and hired a psychologist and criminologist (who testified at trial), and the Supreme Court still held their performance to be constitutionally ineffective. Here, we have no idea whether Knight did any of these things; but, since we are bound by our circuit precedent, we presume that he did.